UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH P. LEFRANCOIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-1968 (RMC) |
| ) | |
| RAYMOND EDWIN MABUS, JR., ) | |
| Secretary of the Navy, ) | |
| ) | |
| Defendant. ) | |

OPINION

Joseph P. Lefrancois seeks a recharacterization of his discharge from the United States Marine Corps. Mr. Lefrancois enlisted in the Marine Corps Reserve in June of 1995. After two periods of Unauthorized Absence, the Marine Corps discharged him with an "Other than Honorable" discharge. He later petitioned the Naval Discharge Review Board (NDRB) and the Board for Correction of Naval Records (BCNR) for review of his discharge; both boards denied his claim for relief. Mr. Lefrancois alleges that the decisions by the NDRB and the BCNR were arbitrary and capricious in violation of section 706 of the Administrative Procedure Act because the boards failed to consider properly whether he was fit for service at the time of his enlistment. Raymond Edwin Mabus, Jr., the Secretary of the Navy, responds that Mr. Lefrancois was properly enlisted because he received a medical waiver for his enlistment and that neither board's decision was arbitrary or capricious. The Court concludes that in the total and complete absence of any evidence in the record that a medical waiver was granted, the boards acted arbitrarily and capriciously in their denial of Mr. Lefrancois's request for relief by failing to consider adequately whether his enlistment was defective.

1

# I. FACTS

## A. Background

On June 27, 1995, Mr. Lefrancois enlisted in the United States Marine Corps Reserve and began a period of active duty on July 5, 1995. AR 3. Prior to enlistment, Mr. Lefrancois filled out a Report of Medical History (Form 93). *See* AR 59-60. He stated that he was in good health and not then taking any medication. AR 59. He also stated that he had never been a patient in any type of hospital and that he had not consulted with or been treated by a doctor within the past five years for other than a minor illness. AR 60. On the same form, however, Mr. Lefrancois stated that he had been treated for a mental condition and further disclosed that he was a patient at Yale-New Haven Hospital from June to August of 1990. He also disclosed weekly sessions with a psychiatrist from September 1990 until August 1992. *Id.*

Mr. Lefrancois served his first few months on duty without incident. On October 22, 1995, however, he failed to return to duty following a period of liberty. During Mr. Lefrancois's period of Unauthorized Absence (UA),[1] he checked himself into Yale-New Haven Hospital ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He remained on UA for 36 days; this period of UA ended on November 16, 1995. In early December, Mr. Lefrancois underwent a psychiatric evaluation at Walter Reed National Military Medical Center (Walter Reed). His treating

---

[1] The Uniform Code of Military Justice states that "[a]ny member of the armed forces who, without authority (1) fails to go to his appointed place of duty at the time prescribed; (2) goes from that place; or (3) absents himself or remains absent from his unit, organization, or place of duty at which he is required to be at the time prescribed; shall be punished as a court-martial may direct." 10 U.S.C. § 886.

2

physician at Walter Reed diagnosed him with ▓▓▓▓▓▓▓▓▓[2] and recommended that he be administratively separated. AR 4.

But shortly before the start of procedures for administrative separation, Mr. Lefrancois began a second period of UA on January 1, 1996. He remained on this period of UA for 114 days. Upon advice of a lawyer, Mr. Lefrancois turned himself in to the military on April 24, 1996. Several days after his surrender, he received emergency ▓▓▓▓ treatment for ▓▓▓▓▓▓▓▓▓. After consultation with a military lawyer, Mr. Lefrancois requested an "Other than Honorable" discharge to avoid facing court-martial proceedings for his two periods of UA.[3] His request was approved, and on June 11, 1996, Mr. Lefrancois was discharged from the Marine Corps with an "Other than Honorable" discharge.

## B. Naval Discharge Review Board Decision

Mr. Lefrancois petitioned the NDRB for review of his discharge on November 29, 1999. AR 12. The NDRB is made up of five military officers, and its role is "to review the discharge or dismissal (other than a discharge or dismissal by sentence of a general court-martial) of any former member of an armed force." 10 U.S.C. § 1553(a), (b); *see also Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 531 (D.C. Cir. 1988) (describing the NDRB). The NDRB "may, subject to review by the Secretary concerned, change a discharge or dismissal, or issue a new discharge, to reflect its findings." 10 U.S.C. § 1553(b). Additionally,

---

[2] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[3] On May 29, 1996, Mr. Lefrancois filled out a second Form 93. *See* AR 68. He stated that he had been a patient in a hospital and that he had consulted or been treated by a doctor within the past five years for other than a minor illness. In addition, under the disclosure that he was a patient at Yale-New Haven Hospital in 1990, Mr. Lefrancois added "paranoia/problems with temper." The Form 93 included his psychiatric treatment post-enlistment as well. *Id.*

the Secretary of the Navy has issued discharge review standards for the NDRB to follow when reviewing a discharge. *See* SECNAVINST 5420.174D, Part V (current version). "The objective of a discharge review is to examine the propriety and equity of the applicant's discharge." *Id.* § 501a. In determining whether a discharge is equitable, the NDRB may consider "whether the individual met normal military standards of acceptability for military service and similar indicators of an individual's ability to serve satisfactorily, as well as ability to adjust to military service." *Id.* § 503c(2).

Mr. Lefrancois requested that his discharge be changed to "general/under honorable conditions or entry level separation or uncharacterized." AR 12. He asserted that at the time of his discharge, "he was suffering from a psychiatric illness which prevented him from understanding the wrongfulness of his conduct." AR 13. The NDRB conducted a documentary discharge review on August 31, 2000 and denied Mr. Lefrancois's request. NDRB explained,

> The Board presumed regularity in the conduct of governmental affairs. After a thorough review of the records, supporting documents, facts, and circumstances unique to this case, the Board found that the discharge was proper and equitable.
>
> In response to the applicant's issue, the Board determined a medical diagnosis on active duty or during post-service, and whether proper or improper, is not an issue upon which this Board can grant relief. When reviewing a discharge, the Board does consider the extent to which a medical problem, diagnosed or undiagnosed while on active duty, might effect an applicant's performance and ability to conform to the military's standards of conduct and discipline. The Board does not consider the circumstances surrounding the applicant's diagnosis or any medical treatment given to the applicant to be of sufficient nature to exculpate the applicant from his misconduct of record. Relief will not be granted at this time.

AR 17 (citations omitted). In conclusion, however, the NDRB encouraged Mr. Lefrancois to apply for a personal appearance hearing. On September 17, 2008, he appeared before the

4

NDRB. Shortly thereafter, the NDRB denied his request for relief. AR 7. The NDRB first noted that Mr. Lefrancois requested a discharge "for the good of the service to escape trial by court-martial." It added that he admitted guilt to the charges preferred against him and made his request with "a complete understanding of the negative consequences of his actions." *Id.* The NDRB went on to explain,

> While he may feel a medical condition was the underlying cause of his misconduct, the record clearly reflects his willful misconduct and demonstrated he was unfit for further military service. The Board carefully considered Applicant's medical history and his explanation for entering into a status of unauthorized absence. The Board concluded neither mitigated his misconduct and that the characterization of his discharge was consistent with the standards of discipline within the Naval Service. The evidence of record does not demonstrate the Applicant was not responsible for his conduct or he should not be held accountable for his actions based on a medical issue. The Board determined an upgrade would be inappropriate.[4]

*Id.*

### C. Board for Correction of Naval Records Decision

On October 13, 2009, Mr. Lefrancois petitioned BCNR for recharacterization of his discharge. AR 225. The BCNR is made up of civilian personnel from the Department of the Navy and can correct a service member's records where "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1); *see also Vietnam Veterans of Am.*, 843 F.2d at 531 (describing the BCNR); 32 C.F.R. § 723.3(e)(2) (The BCNR may deny an application "if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice."). Further, the BCNR "relies on a presumption of regularity to support the

---

[4] Mr. Lefrancois also emphasized his post-service conduct before the NDRB. The NDRB dismissed this basis as a ground for relief as well. It concluded, "[w]hile [it] was impressed with the Applicant's testimony and post-service accomplishments, it did not mitigate the misconduct that resulted in the characterization of discharge and it was determined an upgrade would be inappropriate." AR 7.

5

official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties." 32 C.F.R. § 723.3(e)(2).[5]

In Mr. Lefrancois's application for review, he stated that "[a]t the time of entry and discharge, I was medically unfit for service" and that his discharge should be upgraded for equitable reasons. He also stated that his post-service conduct warranted a discharge upgrade. AR 225. The BCNR initially denied review because Mr. Lefrancois's application fell outside the applicable statute of limitations. *See* Joint Mot. to Stay [Dkt. 7] at 2. After the denial, Mr. Lefrancois filed suit in this Court. Pursuant to a joint motion filed by the parties,[6] the Court stayed the case and ordered the BCNR to consider the merits of his application for review. *See* Order [Dkt. 8]. On June 29, 2011, the BCNR issued a three-page letter detailing its decision to deny Mr. Lefrancois the relief he sought. The BCNR concluded that "[a]fter careful and conscientious consideration of the entire record, the Board found the evidence submitted was insufficient to establish the existence of probable material error or injustice." It expounded,

> The Board, in its review of your entire record and application carefully weighed all potentially mitigating factors, such as your desire to upgrade your discharge. It also considered your assertion that you should not have been allowed to enlist because of your mental health problems, specifically, ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ Nevertheless, the Board co           re not sufficient to warrant recharacterization of your discharge because of the seriousness of your repeated and lengthy periods of UA from the Marine Corps during such a short term of service, and which also resulted in your request for discharge . . .
>
> [T]he Board concluded that your request for separation because of your misconduct and not for medical reasons was proper and

---

[5] When the BCNR denies an application without a hearing, the determination must "be made in writing and include a brief statement of the grounds for denial." The brief statement must include "the reasons for the determination that relief should not be granted." *See* 32 C.F.R. § 723.3(e)(3), (4).

[6] The parties agreed that Lefrancois's delay was due to his reliance on NDRB counsel. *See* Joint Mot. to Stay [Dkt. 7] at 3.

> procedurally correct. Further, in regard to your assertion, the Board believed that had you disclosed, in detail, your mental and medical history, a fraudulent entry would not have occurred. Finally, the Board believed that considerable clemency was extended to you when your request for discharge to avoid trial by court-martial was approved.

AR 4-5. The parties cross-move for summary judgment.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56[] does not apply because of the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); *see also Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126-27 (D.D.C. 2012); *Buckingham v. Mabus*, 772 F. Supp. 2d 295, 300 (D.D.C. 2011). Under the APA, the agency's role is to resolve factual issues to reach a decision supported by the administrative record, while "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (internal quotation marks omitted)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

### B. APA

A reviewing court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[D]ecisions regarding the correction of military records are reviewable under the 'arbitrary or capricious' standard of APA § 706." *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (articulating the Supreme Court's holding in *Chappell v. Wallace*, 462 U.S. 296 (1983)). Generally speaking, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). At the same time, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir.1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). While the agency action under review is "entitled to a presumption of regularity[,] . . . that presumption is not to shield [an] action from a thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

The Court reviews decisions by military correction boards under "an unusually deferential application of the 'arbitrary or capricious standard.'" *Kreis*, 866 F.2d at 1514; *see also Cone v. Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) ("This deferential standard is calculated to ensure that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings, a result that would destabilize military command and take the

judiciary far afield of its area of competence."). The plaintiff "bears the burden of overcoming 'the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully and in good faith.'" *Roberts v. Harvey*, 441 F. Supp. 2d 111, 118 (D.D.C. 2006) (quoting *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997)). The Court need only determine "whether the Secretary's decision making process was deficient, not whether his decision was correct." *Kreis*, 866 F.2d at 1511. But the deferential standard "does not mean that it is a rubber stamp of approval." *Miller v. Roche*, No. 03-1742, 2004 WL 3257070, at *6 (D.D.C. Nov. 4, 2004). While the military's discretion is broad, it is not boundless. *Id.; see also Roberts*, 441 F. Supp. 2d at 119 ("Although only the 'most egregious' Board decisions will fail to satisfy this deferential standard of review, a plaintiff nevertheless can establish that the Board's decision-making process was flawed and in violation of the APA by showing that the Board did not consider or respond to an argument that does not appear 'frivolous' on its face and 'could affect the Board's ultimate disposition.'" (quoting *Frizelle*, 111 F.3d at 177) (internal citation omitted)).

### III. ANALYSIS

Mr. Lefrancois asserts that the NDRB and the BCNR acted arbitrarily and capriciously by failing to consider his medical disqualification for service and the Marine Corps's obligation to investigate his defective enlistment given his mental history. The Secretary responds that Mr. Lefrancois properly enlisted in the Marine Corps because he received a medical waiver. Further, the Secretary claims that "the BCNR's review of the applicable medical regulations coupled with its reasonable reliance on the presumption of regularity was sufficient to establish that a medical waiver was granted." Def. Reply [Dkt. 28] at 12. Because the administrative record does not contain any evidence that any one of the multiple steps leading to a medical waiver occurred or that a medical waiver was granted, the Court concludes

that the boards' decisions were arbitrary and capricious due to their failure to consider adequately Mr. Lefrancois's defective enlistment claim.

At the time Mr. Lefrancois applied for enlistment, his history of mental illness, including his prior hospitalization and prolonged care by a physician, constituted a "cause[] for rejection" under section 15-54 of the Manual of the Medical Department (MANMED) (1992 ed.).[7] *See* Def. Opp., Ex. 1 (MANMED) at 2. A waiver could be obtained for a cause of rejection, permitting entry into service that would otherwise be prohibited. *See* MANMED § 15-73, 74; Elias Decl. at 2. If an applicant for enlistment reported a medical condition that was a cause for rejection, the medical examiner could request a waiver by submitting a form with a description of the defect(s) and the examiner's recommendation to the Bureau of Medicine and Surgery (BUMED). *See* MANMED § 15-74(2)(a) ("[The] [c]ommanding officer of the member, or of a hospital or clinic; examining or responsible medical officer; or, the service member may request a waiver."); *id.* § 15-74(3) (referral to BUMED). The manual also required that "WAIVER RECOMMENDED" appear on the top right of the form. *Id.* § 15-74(3). Additionally, applicants with a history of depression were required to undergo a thorough psychiatric evaluation to assess their "maturity, emotional stability, and suitability for service." *See id.* § 15-75(3). Upon receipt of the waiver application, BUMED would review the relevant documentation and make a recommendation to the office of the Commandant of the Marine

---

[7] The Secretary explains that MANMED was the manual governing enlistment standards at the time of Mr. Lefrancois's application. *See* Def. Opp. [Dkt. 23] at 9-10. In support of this explanation, the Secretary provides the Court with the declaration of Commander Walter Elias III who, at the time of filing, served as the Head of Qualifications and Standards with the Bureau of Medicine and Surgery in the Navy. *See id.*, Ex. 2 (Elias Decl.). While Mr. Lefrancois relies in his motion for summary judgment on a Department of Defense instruction for enlistment standards, he relies on the relevant MANMED provisions in his Reply. The Court accepts the Secretary's explanation of its own regulations at the time of Mr. Lefrancois's application for enlistment.

Corps (CMC). The CMC made the final decision to grant or deny waivers after reviewing BUMED recommendations. *Id.* § 15-74; Elias Decl. at 2. An applicant with a known defect could not be ordered to active duty unless CMC granted a waiver of the defect. *See* MANMED § 15-74(3) ("Applicants may not be processed for transfer until a written waiver has been received from the appropriate waiver authority and made part of the permanent Health Record.").

The Marine Corps recognized the potentially disqualifying medical information that Mr. Lefrancois disclosed on his Form 93 and requested that he be medically evaluated for service. The record reflects that before Mr. Lefrancois's enlistment, the Marine Corps received his medical records from Yale-New Haven Hospital, which stated that his treating physician diagnosed him with [REDACTED] upon discharge, with multiple medications. AR 140. The record also includes a letter dated May 13, 1994 from Dr. Gallalee, the physician that Mr. Lefrancois saw for psychotherapy from August 1990 until May 1992 following his discharge from Yale-New Haven Hospital, regarding his assessment of Mr. Lefrancois's mental health. AR 123. Dr. Gallalee stated that although Yale-New Haven Hospital diagnosed Mr. Lefrancois with [REDACTED] after his work with Mr. Lefrancois, he thought that the correct diagnosis was [REDACTED], stemming from the divorce of Mr. Lefrancois's parents. He concluded that "[a]t the time of [Mr. Lefrancois's] stopping treatment, [Mr. Lefrancois's] [REDACTED] was resolved." *Id.* The record further shows that on July 6, 1994, Dr. Frederick Roddy at the Military Entrance Processing Station requested a "consultation" to evaluate Plaintiff for military service in light of his "history of [REDACTED]" AR 124-25. However, no additional documentation regarding the Marine Corps's evaluation of Mr. Lefrancois's mental health appears in the administrative record after the physician referral in July of 1994.

The NDRB considered Mr. Lefrancois's medical history only as a basis for explaining his misconduct—not in regard to his defective enlistment claim—and concluded that it did not "mitigate[] his misconduct and that the characterization of his discharge was consistent with the standards of discipline within the Naval Service." AR 7. The BCNR, however, stated that it considered Mr. Lefrancois's argument that he was unfit for service at the time of his enlistment but concluded that this argument was insufficient "to warrant recharacterization of [Mr. Lefrancois's] discharge" under the circumstances. The BCNR further stated that it "believed that had [Mr. Lefrancois] disclosed, in detail, [his] mental and medical history, a fraudulent entry would not have occurred." AR 4-5. Neither the NDRB nor the BCNR made any statements regarding whether the Marine Corps granted Mr. Lefrancois a medical waiver for his enlistment.

Both boards' decisions failed to address adequately whether Mr. Lefrancois was enlisted properly in the Marine Corps. The Secretary claims that "the record demonstrates the military's identification of his potentially disqualifying medical information, a referral for additional evaluations, and his acceptance and entrance to active duty in the USMC subsequent to examinations." Def. Reply at 9-10. The Secretary asks the Court to rely on the presumption of regularity, see Roberts, 441 F. Supp. 2d at 118-19, to infer from these undisputed facts that there was a response to the request for consultation, that the appropriate official recommended a waiver, that a thorough psychiatric exam occurred, that BUMED reviewed the waiver application and recommended that a waiver be granted, and that the CMC agreed with the recommendation, issued a waiver, and it was made part of Mr. LeFrancois's permanent Health Record. However, nowhere in the administrative record is there any evidence that the Marine Corps took any one of these steps. The record does not contain a response to the request for

consultation or an application for waiver in conformance with the requirements of MANMED § 15-74(3). The record does not contain any documentation of a thorough psychiatric examination for depression or a recommendation by BUMED. Finally, the record contains no indication that the CMC agreed to issue a waiver or did so. In fact, there is no evidence in the record of any steps taken by the Marine Corps to investigate Mr. Lefrancois's mental health after Dr. Roddy's request for a medical consultation in July of 1994—much less evidence which actually points to adherence to the process stipulated by MANMED. The Secretary seeks to prove too much from the facts that are in the record. The presumption of regularity is overcome by the total absence of any record evidence of any one of the multiple paper-intensive steps that were required before Mr. Lefrancois could be properly inducted.

Moreover, paragraph 6204 of the Marine Corps Separation and Retirement Manual (Separation Manual) states that any case that comes to the attention of a commander concerning erroneous enlistment must be investigated and "a complete report promptly submitted to the CMC." *See* Notice of Filing [Dkt. 31], Ex. 1. It is well settled that an agency must follow its own regulations. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); *Blassingame v. Sec'y of the Navy*, 866 F.2d 556, 560 (2d Cir. 1989) (stating that "we require only that the [Navy] carry out the procedures and regulations it created itself" (alteration in original) (internal quotation mark and citation omitted)). The record bears no indication that at any time Marine Corps officials investigated whether Mr. Lefrancois was erroneously enlisted.

In addition to Mr. Lefrancois's initial disclosure that he was a patient at Yale-New Haven Hospital for two months in 1990 and that he had weekly psychotherapy sessions with a

13

specialist for two years following his hospitalization, the Marine Corps had before it Mr. Lefrancois's extensive history of mental health illness, including his discharge diagnosis of ▓▓▓▓ by his treating physician at Yale-New Haven Hospital in 1990. AR 140. The same Yale-New Haven Hospital record also states that upon discharge Mr. Lefrancois was prescribed three medications for his mental health—▓▓▓▓ *Id.* After his first period of UA, a physician at Walter Reed diagnosed him with ▓▓▓▓ and recommended that he be administratively separated. After his second period of UA and shortly before his discharge, Mr. Lefrancois received emergency ▓▓▓▓ treatment for ▓▓▓▓ ▓▓▓▓. Despite his history of mental illness and apparent mental instability during his period of active duty, based on the record, no Marine Corps officials investigated the possibility of his erroneous enlistment during his service or when considering his discharge. And the record of the NDRB and BCNR proceedings nowhere suggest that either board considered whether the Marine Corps investigated Mr. Lefrancois's possible erroneous enlistment.

      BCNR avoids addressing the question of erroneous enlistment by placing the blame on Mr. Lefrancois and characterizing his enlistment as "fraudulent entry." AR 5. Indeed, while a Marine may be separated on the basis of erroneous enlistment and receive an honorable or uncharacterized discharge, the action must not be "the result of fraudulent conduct." Separation Manual ¶ 6204. In fact, Mr. Lefrancois's initial Form 93 contained some inconsistencies. Despite answering "no" to whether he had ever been a patient in a hospital and to whether he had consulted or been treated by a doctor within the past five years, he affirmatively disclosed the fact of his history of mental illness. His disclosure was sufficient to

raise a flag for the Marine Corps to require further investigation into Mr. Lefrancois's mental health.[8] *See* AR 124-25 (request for consultation by Dr. Roddy).

Further, the Secretary does not allege that Mr. Lefrancois procured his enlistment by fraud but instead argues that he was properly enlisted because a waiver was granted. The Secretary states that the BCNR made a "determination" and "correctly concluded" that a medical waiver was granted. Def. Reply at 10. BCNR's decision, however, makes no mention of a medical waiver. Instead, BCNR concluded that Mr. Lefrancois made a "fraudulent entry." The Secretary's argument that Mr. Lefrancois was enlisted properly is not consistent with BCNR's conclusion that he made a "fraudulent entry" into the Marine Corps. Without a careful examination of Mr. Lefrancois's defective enlistment claim, BCNR's finding of fraud and conclusion that the circumstances did not warrant a discharge upgrade were arbitrary and capricious in violation of the APA. *See Blassingame*, 866 F.2d at 560 ("But for the Corps's initial improper induction and subsequent failure to investigate, Blassingame's record might have been spared the blemish of an 'undesirable' discharge.").

## IV. CONCLUSION

The Court will grant Mr. Lefrancois's Motion for Summary Judgment [Dkt. 21] and deny the Secretary's Cross-Motion for Summary Judgment [Dkt. 23]. The case will be remanded to the BCNR to reconsider Mr. LeFrancois's application in light of this Opinion. A memorializing Order accompanies this Opinion.

Date: November 30, 2012
                                                       /s/
                                         ROSEMARY M. COLLYER
                                         United States District Judge

---

[8] The Marine Corps received Mr. Lefrancois's Yale-New Haven Hospital discharge summary before Mr. Lefrancois's enlistment; it discussed his mental health in detail including his diagnosis of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* AR 140.